IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ANTONIO ORTIZ )<br>*Plaintiff,* )<br>)<br>v. )<br>)<br>WELLPATH, f/k/a CORRECT CARE )<br>SOLUTIONS, LLC, GEISINGER )<br>CLINIC, ZACH ROTTMAN, DO )<br>DANIEL LONGACRE, PA, )<br>*Defendant*. ) | Docket No. 4:22-cv-853<br><br><br><br>**JURY TRIAL DEMANDED** |

## AMENDED COMPLAINT

Plaintiff Antonio Ortiz, by his attorneys at the Mizner Law Firm, files this Amended Complaint and states as follows:

### A. Parties.

1. Plaintiff Antonio Ortiz is an adult individual who is currently incarcerated at the State Correctional Institution at Coal Township ("SCI Coal Township"), located at 1 Kelley Dr, Coal Township, Pennsylvania, 17866.

2. Defendant Wellpath, formerly known as Correct Care Solutions, LLC ("Wellpath") is a Kansas Corporation with a principal place of business at 1283 Murfreesboro Pike Street 500, Nashville, TN 37217-2421. Wellpath provides, through a contract with the Commonwealth, medical care and services for the Department of Corrections, including the State Corrections Institute at Houtzdale, during the relevant time period. Wellpath is vicariously liable for the acts of its employees, agents and/or servants, including without limitation Zach Rottman, DO.

1

3. Defendant Geisinger Clinic, also known as Geisinger Health System ("GHS") is a regional health care provider to central, south-central and northeastern Pennsylvania, with headquarters located at 100 N Academy Ave, Danville, Pennsylvania, 17822. GHS is responsible for the acts and omissions of its employees, agents and contractors, including without limitation Daniel Longacre, PA.

4. Defendant Zach Rottman, DO is an adult individual who at all times was employed as a medical provider by Wellpath to provide medical services at SCI Coal Township, or was acting as an agent on its behalf. At all times, Dr. Rottman was acting under color of state law and within the course and scope of his employment and/or agency with Wellpath.

5. Defendant Daniel Longacre, PA is an adult individual who at all times was employed as a medical provider by GHS to provide medical services at Geisinger Shamokin Area Community Hospital, or was acting as an agent on its behalf. At all times, PA Longacre was acting within the course and scope of his employment and/or agency with GHS.

## B. Jurisdiction and Venue

6. This action is being brought under the Civil Rights Act, 42 U.S.C. § 1983 which provides a cause of action for the "deprivation of any rights, privileges, or immunities secured by the Constitution and the laws" of the United States.

7. This Honorable Court has jurisdiction over these federal claims pursuant to 28 U.S.C. §§ 1331 & 1343.

8. This Complaint also includes pendent state law claims, over which this Honorable Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

9. Venue is proper in the Middle District of Pennsylvania pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred within the territorial jurisdiction of this District and the Defendants are subject to personal jurisdiction within this District.

## C. Facts

10. At all relevant times, Mr. Ortiz has been incarcerated at SCI Coal Township.

11. On July 30, 2020, Mr. Ortiz injured his knees while exercising during "yard."

12. While playing basketball, he jumped and when he landed he heard both of his knees "pop," and was immediately unable to walk, to the extent that he had to be brought to the medical department by stretcher.

13. When he arrived in the prison medical department, he was seen by Zach Rottman, DO, who noted that Mr. Ortiz was unable to bend his knees, and that initial x-rays revealed bilateral superior knee displacement. Both of these findings, along with the mechanism of his injury, were suggestive of patellar tendon rupture.

14. Dr. Zottman's sent Mr. Ortiz to Geisinger Shamokin Area Community Hospital for "urgent" evaluation.

15. At the hospital, Mr. Ortiz was assessed in the Emergency Department by Kyle David Yebernetsky, MD, and Matthew Deysher, PA-C. Mr. Ortiz relayed the manner of his injury and complained of immediate pain, swelling and inability to bear weight or to walk following his injury earlier that day. The on-call orthopedic physician's assistant, Daniel Longacre, was contacted to assess Mr. Ortiz.

16. PA Longacre reviewed Mr. Ortiz's x-rays online and recommended outpatient followup, along with a referral to sports medicine, for what she deemed to be chronic condition of high riding patella, not an acute injury.

17. Mr. Ortiz was never seen in person to be physically evaluated by PA Longacre or any other orthopedic provider during his time in the Emergency Department.

18. PA Longacre, in turn, without ever seeing or physically examining Mr. Ortiz herself, advised Dr. Yebernetsky that it was fine to discharge Mr. Ortiz with a plan of an outpatient orthopedic consultation at a later date.

19. PA Deysher placed an Orthopedic Sports Medicine referral for follow up when Mr. Ortiz was discharged from the Emergency Department but neither he, Dr. Yebernetsky or PA Longacre did anything to arrange or schedule this outpatient orthopedic evaluation.

20. Unfortunately, Mr. Ortiz was not sent to an orthopedic specialist for over eight months.

21. Following his brief visit to the emergency room, Mr. Ortiz was then returned to the prison, where Dr. Rottman noted that he still was unable to bear weight, and only had fifteen (15) degrees of flexion in his knees. Normal flexion at the knee is 135 degrees.

22. The treatment plan was to observe him overnight and try weightbearing again the following day, and that if he was still unable to stand, then he would need long term care in the infirmary "until he can" stand.

23. The next day, on July 31, 2020, Dr. Rottman noted that any flexion of Mr. Ortiz's knee was "very painful," and that although he could flex his knees to 90 degrees, that movement caused "intense" pain.

24. Mr. Ortiz's knees were so painful that he required nursing assistance to move from his wheelchair, and therefore the plan was for an orthopedic evaluation.

25. Dr. Rottman recorded his treatment plan as "orthopedic evaluation," as was recommended on his discharge from the Emergency Department. But there is no evidence that such a consult was ever ordered or scheduled by Dr. Rottman at this time.

26. On August 3, 2020, Mr. Ortiz was seen again by Dr. Rottman, who recorded that he was still unable to bear weight one week after the injury. His pain that day was eight out of ten. Dr. Rottman submitted a request to Utilization Review for an MRI of both knees. There is no evidence that an MRI was ordered by Dr. Rottman or ever scheduled at this time.

27. On August 11, 2020, Mr. Ortiz was seen by Dr. Rottman, who noted that he was able to transfer himself from his wheelchair, but was still limited to bearing only about 30% of his weight on his feet, and that he could not flex his knees past 90 degrees. Dr. Rottman also noted that Mr. Ortiz's patellas, or knee caps, moved about "freely" on examination.

28. Even though Mr. Ortiz could no longer walk, Dr. Rotmman discharged Mr. Ortiz from the Infirmary back to "general population" with a wheelchair to use. A repeat x-ray of his knees was ordered.

29. On August 13, 2020, the x-ray report indicated there was no acute fracture but the patella were not in normal anatomical position. The radiologist suggested clinical correlation for findings of patellar tendon injury.

30. On September 11, 2020, Dr. Rottman submitted a request for physical therapy for Mr. Ortiz, noting "Would like PT for rehab prior to MRI (if needed)."

31. On September 25, 2020, Mr. Ortiz was seen for his physical therapy consultation, and the physical therapist recommended an MRI and orthopedic review of his condition.

32. On October 2, 2020, Mr. Ortiz was seen by Charles McClure, MD, who noted that he had displaced patella bilaterally and had gone to physical therapy without improvement, was still wheelchair bound and was unable to walk or stand.

33. Dr. McClure's treatment plan was substantially identical to the plan which Mr. Ortiz was originally given two months earlier on July 31, 2020; namely orthopedic evaluation.

34. On October 10, 2020, Dr. Rottman noted that the physical therapist had recommended an MRI with an orthopedic review.

35. However, there is no indication that Dr. Rottman requested or scheduled an orthopedic consultation or an MRI.

36. On October 30, 2020, Dr. Rottman once again noted that Mr. Ortiz still could not walk or stand on his own, and finally submitted a consultation request for diagnostic testing of his knees - three months since he was originally recommended for an orthopedic evaluation.

37. On November 5, 2020, Dr. McClure submitted a consultation request for an MRI of Mr. Ortiz's knees and for an orthopedic surgery evaluation. He noted in the orthopedic consultation request: " He is unable to walk and has been wheelchair bound since the end of July."

38. However, on November 23, 2020, Mr. Ortiz's appointment at Geisinger Medical Center Orthopedics was canceled due to the increase in Covid-19 cases.

39. On November 30, 2020, the MRI of Mr. Ortiz's left knee indicated chronic patellar tendon rupture, mild patellar chondrosis, and a full-thickness tear involving the proximal patellar tendon with avulsion of small ossific fragments from the inferior pole of the patella, along with a partial-thickness tear of the patellar cartilage.

40. That same day, an MRI of Mr. Ortiz' right knee showed chronic patellar tendon rupture, ruptured proximal patellar tendon on a backdrop of diffuse tendon thickening compatible with tendinopathy, and a low-grade partial-thickness tear of patellar cartilage.

41. Despite these findings, Mr. Ortiz was not seen at Geisinger Orthopedics until April 8, 2021, more than eight months after his injuries.

42. PA-C Jenna Marire Lindermuth noted that Mr. Ortiz was still unable to walk, **having been in that condition since July 30th**, and that he was in a wheelchair.

43. Mr. Ortiz's x-rays were reviewed by orthopedic surgeon Gregory Fanelli, MD, who diagnosed him with chronic patellar tendon ruptures.  The plan was for surgical repair of the bilateral patella tendon.

44. On April 21, 2021, Timothy Doyle, MD, noted that Mr. Ortiz was being recommended for surgical repair, and therefore referred his case to Wellpath's "collegial review" to authorize the surgical repair.

45. On May 6, 2021, Dr. Rottman also noted that Mr. Ortiz had been recommended for surgical repair by the outside orthopedic specialists.

46. On May 10, 2021, Mr. Ortiz was finally approved for orthopedic surgery, and the procedure was scheduled for September 3, 2021, at Geisinger Medical Center.

47. The bilateral surgery finally took place on September 3, 2021, **more than thirteen months after Mr. Ortiz's injury**.

48. Mr. Ortiz was left wheelchair bound and unable to walk or stand for more than thirteen months, all because his various providers, both inside and outside the prison, failed to timely diagnose his injury, and order corrective surgery.

49. Because the surgery was so delayed, Mr. Ortiz endured a longer recovery process than his injury otherwise required, because the detached muscle in his knees atrophied, making it more difficult to recover after surgery.

50. The surgery itself was also a more traumatic process, as the detached ligaments were more difficult to reattach after thirteen months, than they would have been in the weeks following the injury.

51. On January 13, 2021, Mr. Ortiz filed a grievance against the medical staff at SCI Coal Township, including Dr. Rottman, pointing out that his injury of July 30 was not properly diagnosed until the MRI of November 30, and that he had not received any corrective care since the diagnosis was completed.

52. On January 22, 2022, the grievance was denied. In particular, the response stated: "the medical department and all staff you list in your grievance have done everything they can to address your concerns."

53. At the time, this response was laughable and demonstrably false; in hindsight, knowing that Mr. Ortiz's surgery would still not take place for nearly nine more months, the response seems particularly cruel.

54. Mr. Ortiz timely appealed, and he received a second denial on February 13, 2021, which stated that the initial denial "poignantly addressed all concerns," and that the grievance "lacks any arguable basis in law, fact and/or policy."

55. Despite this thoughtful response, Mr. Ortiz timely filed his final appeal on February 28, 2021.

56. In a turn of events reminiscent of the delays in his medical care, Mr. Ortiz did not receive any response to his appeal, other than a form notice of extension on March 29, 2021.

57. By letters dated May 24 and August 23, 2021, Mr. Ortiz inquired whether the DOC intended to provide him a final response, writing "I have not received a decision from your office as of yet. Can you please explain why that is?"

58. Based on the Department of Corrections failure to provide a final response to his grievance, Mr. Ortiz believes and therefore avers that the grievance process has been made unavailable to him, and that he is therefore permitted to file this action without technically receiving a final denial on the merits of his grievance.

### COUNT I - DELIBERATE INDIFFERENCE
### IN VIOLATION OF THE EIGHTH AMENDMENT

*Antonio Ortiz*
*v.*
*Zach Rottman, DO*

59. The averments in the preceding paragraphs are incorporated by reference, as if set forth in full herein.

60. "Failure to provide medical care to a person in custody can rise to the level of a constitutional violation under § 1983 only if that failure rises to the level of deliberate indifference to that person's serious medical needs." *Groman v. Twp. of Manalapan*, 47 F.3d 628, 637 (3d Cir. 1995).

61. A "serious medical need" is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987).

62. A prison official acts with deliberate indifference to an inmate's serious medical needs when he "knows of and disregards an excessive risk to inmate health or safety; the official

must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

63. Mr. Ortiz's bilateral patellar rupture was a serious medical condition, which prevented him from standing and walking, and confined him to a wheelchair.

64. Dr. Rottman was fully aware that Mr. Ortiz was in this condition due to an acute injury, yet took ineffective action to diagnose or treat his condition. Specifically, Dr. Rottman failed to have Mr. Ortiz timely follow-up with an orthopedic specialist, as recommended by the hospital on the day of the injury.

65. Dr. Rottman also failed to timely order any diagnostic testing, even when other medical providers such as the physical therapist recommended it, delaying his diagnosis from July 30, 2020, the date of injury, until November 30, 2020.

66. Once the injury was properly diagnosed, it took another five months for Mr. Ortiz to be seen by the orthopedic specialist, and another five months after that, for his surgery to take place.

67. During this entire thirteen month period, Mr. Ortiz was unable to stand or walk, leaving him disabled and highly vulnerable. While there is no "good" place to be temporarily disabled, state prison is one of the worst that a person could find themselves.

68. Despite his first-hand knowledge of Mr. Ortiz's condition, Dr. Rottman, through his inaction, delayed and denied Mr. Ortiz the individualized care his serious medical needs required - namely, a consultation with an orthopedic surgeon, and surgical repair of his knees - for over thirteen months.

69. By denying Mr. Ortiz timely, individualized care and treatment of his knee injuries, Dr. Rottman has denied him treatment which was consistent with the medical standard of care, and has by omission imposed punishment far in excess of that authorized by law, contrary to the Eighth Amendment.

70. The denial of timely medical care for Mr. Ortiz's injuries violated all standards of decency, contrary to the Eighth Amendment, and subjected him to a more traumatic surgery, with a longer recovery time, as well as depriving him of the ability to stand or walk during the interim period.

WHEREFORE, Plaintiff Antonio Ortiz seeks judgment in his favor and against Zach Rottman, DO in an amount in excess of $75,000, along with all other relief permitted by law.

## COUNT II
## PROFESSIONAL NEGLIGENCE

*Antonio Ortiz*
*v.*
*Wellpath, Geisinger Clinic, Zach Rottman, DO, Daniel Longacre, PA*

71. The averments in the preceding paragraphs are incorporated by reference, as if set forth in full herein.

72. As Mr. Ortiz's treating medical providers, employees and/or agents of Wellpath and GHS, including but not limited to the individual medical defendants, owed a duty of care to Mr. Ortiz to ensure that he was timely diagnosed and treated.

73. Another aspect of this duty was to provide Mr. Ortiz with the minimum standard of care required for someone in his condition and with his medical needs.

74. The standard of care for someone in Mr. Ortiz's condition was to be seen promptly by an orthopedic specialist for a consultation, and to follow the recommendation of the specialist.

75. The individual medical defendants failed and refused to ensure Mr. Ortiz was timely seen by an orthopedic specialist for a consultation, or to otherwise take the proper action to accurately diagnose Mr. Ortiz with bilateral patellar tendon ruptures.

76. The PADOC contracted with Wellpath to provide medical care and services for the PADOC, including at SCI Coal Township, during the relevant time period.

77. Wellpath and/or its employees and/or agents are responsible to ensure that Mr. Ortiz was referred to an orthopedic specialist for a consultation.

78. Similarly, GHS and its employees and/or agents were responsible to ensure that Mr. Ortiz was properly diagnosed, in part by ensuring that he was timely evaluated by an orthopedic specialist.

79. PA Longacre was an orthopedic specialist who was contacted about Mr. Ortiz while he was in the hospital after being injured.

80. Instead of examining Mr. Ortiz himself, PA Longacre directed that Mr. Ortiz could be discharged from the hospital back to the prison, without properly diagnosing his patellar tendon rupture, or making any provision to timely see Mr. Ortiz in an outpatient setting.

81. The medical care, diagnosis, treatment and services rendered by the individual medical defendants, and possibly other employees and/or agents of Wellpath and GHS, was performed in a negligent and careless manner and not in accordance with professional standards required of the conditions presented by Mr. Ortiz. A diagnosis of patellar tendon rupture is a typical injury seen in Emergency Departments and treated on a regular basis by orthopedic providers, it is not a rare condition.

82. The individual medical defendants, and possibly other employees and/or agents of Wellpath and GHS, failed to possess and/or exercise adequate medical skills, knowledge, experience and techniques for the proper treatment of Mr. Ortiz.

83. As a direct and proximate result of the negligence by the employees and agents of Wellpath and GHS, including but not limited to the individual medical defendants, and possibly other employees and/or agents of Wellpath and GHS, Mr. Ortiz was left in pain without the ability to stand or walk for more than thirteen months, and a more lengthy and difficult post-surgical recovery process than would otherwise have been necessitated by his injury.

84. As a direct and proximate result of the negligence by the employees and agents of Wellpath and GHS, including but not limited to individual medical defendants, Mr. Ortiz has experienced pain and suffering, inconvenience, limitation on activities of daily living, mental anguish, and humiliation and embarrassment.

85. Wellpath and GHS are vicariously liable for the negligent actions of their employees and/or agents, including but not limited to the individual medical defendants.

WHEREFORE, Plaintiff Antiono Ortiz seeks judgment in his favor and against Zach Rottman, DO, Daniel Longacre, PA, Wellpath and Geisinger Clinic in an amount in excess of $75,000, along with all other relief permitted by law.

    Respectfully submitted,

    MIZNER LAW FIRM

    By: /s/ John F. Mizner

    John F. Mizner
    PA Bar No. 53323
    jfm@miznerfirm.com

    311 West Sixth Street
    Erie, Pennsylvania 16507

(814) 454-3889

*Attorney for the Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANTONIO ORTIZ | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | Docket No. 4:22-cv-853 |
| WELLPATH, f/k/a CORRECT CARE SOLUTIONS, LLC, GEISINGER CLINIC, ZACH ROTTMAN, DO DANIEL LONGACRE, PA, | ) ) ) ) | |
| *Defendant*. | ) | **JURY TRIAL DEMANDED** |

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 23, 2022, the foregoing Amended Complaint was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to all parties who have appeared of record by operation of the Courts ECF system and constitutes service of this filing under Rule 5(b)(2)(E) of the Federal Rules of Civil Procedure. Those parties may access this filing through the courts ECF system.

/s/ John F. Mizner
John F. Mizner